**NATURAL RESOURCES DEFENSE COUNCIL, INC., Plaintiff,**

v.

**Russell TRAIN, Administrator of the Environmental Protection Agency, et al., Defendants.**

Civ. A. No. 1629–73.

United States District Court, District of Columbia.

March 24, 1975.

As Amended June 10, 1975.

**1394**

Lloyd S. Guerci, Land & Natural Resources Div., U. S. Dept. of Justice, Washington, D. C., for Russell Train and defendant EPA.

Charles W. Bills, Washington, D. C., for defendant National Milk Products.

Guy Martin, Washington, D. C., for defendant National Livestock Feeders Assn.

Irvin B. Nathan, Arnold & Porter, Washington, D. C., for defendant National Forest Products Assoc.

Theodore O. Trove, Asst. Atty. Gen., Olympia, Wash., for defendant State of Washington, Dept. of Natural Resources.

Christopher D. Williams, McCarty & Noone, Washington, D. C., Merrick S. Rayle, Whitfield, Musgrave, Selvy, Kelly & Eddy, Des Moines, Iowa, for Colorado River Water Conservation District.

William Tucker, Asst. Atty. Gen., Denver, Colo., for defendant State of Colorado Water Quality Control Commission.

## MEMORANDUM

FLANNERY, District Judge.

This matter is before the court on motions to dismiss and for summary judgment. Federal defendants Russell Train, Administrator of the Environmental Protection Agency (EPA), and the EPA, and defendants-intervenors National Livestock Feeders Association, the State of Washington, Department of Natural Resources, and the State of Colorado, Water Quality Control Commission, have filed motions to dismiss for failure to state a claim upon which relief can be granted. The motions by all but the State of Colorado have been supported by material outside the pleadings and will be considered motions for summary judgment. Fed.R.Civ.P. 12(b). Plaintiff Natural Resources Defense Council (NRDC) and defendants-intervenors National Forest Products Association and the Colorado River Water Conservation District have filed motions for summary judgment denominated as such. Defendant-intervenor National Milk Producers Federation opposes plaintiff's motion for summary judgment but has filed no motion.[1]

This case involves important questions of statutory interpretation of sections of the Federal Water Pollution Control Act Amendments of 1972 (FWPCA), Pub.L. No. 92–500, 86 Stat. 816, 33 U.S.C. § 1251 et seq. (Supp. III, 1973). This lengthy and complicated Act has the stated objective of restoring and maintaining the integrity of the nation's waters. See FWPCA § 101(a), 33 U.S.C. § 1251(a) (Supp. III, 1973). In order to accomplish this goal the discharge of pollutants into the navigable waters of the United States is to be eliminated by 1985. In the interim, a number of mechanisms and deadlines are established for regulating discharges. Section 301(a) of the Act provides that, with only a few exceptions, any discharge of pollutants by any person is unlawful. Id. § 1311(a). One of the exceptions is for discharges made under a permit issued by the Administrator of EPA pursuant to the National Pollutant Discharge Elimination System (NPDES) established by section 402 of the Act. Id. § 1342. That section provides in pertinent part:

> Sec. 402. "(a)(1) . . . the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combi-

---

1. The State of Colorado, Water Quality Control Commission, and the Colorado River Water Conservation District were granted leave to intervene on the condition that they take no active part in the litigation until the present motions had been determined. However, the court ordered their motions to dismiss and for summary judgment filed and has considered their arguments.

nation of pollutants, notwithstanding section 301(a) . . . ."

*See id.* § 1342(a)(1). Under such a permit the discharge must meet the effluent standards established by the Act.

The term discharge of pollutants is defined in section 502(12) of the Act to mean any addition of any pollutant to the navigable waters from any point source. *See id.* § 1362(12). Thus, all nonpoint sources are excluded from the effluent limitations and the NPDES program. They are not subject to the stringent control scheme established for point sources. The term point source is defined as follows:

> Sec. 502. . . . (14) The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.

*See id.* § 1362(14). In 1973 the Administrator of EPA promulgated regulations which exempted certain sources from the NPDES permit requirements. These included discharges from storm sewers composed entirely of storm runoff uncontaminated by industrial or commercial activity; from relatively small animal confinement facilities; from silvicultural activities; and irrigation return flow from point sources where the flow is from less than 3000 acres. *See* 40 C.F.R. §§ 125.4(f), (j) (1974).[2] These exemptions were only from the requirement to apply for a permit. They did not waive the applicable effluent limitations or other standards established under the Act. 38 Fed.Reg. 18001–02 (1973). Additionally, the exemptions do not extend to discharges

from activities which the Administrator of EPA or the director of a state water pollution agency identifies as a significant contributor of pollution. 40 C.F.R. §§ 124.11(h)(5), 125.4(j)(5) (1974).

Plaintiff NRDC challenges these regulations and asks for a declaratory judgment that the Administrator's action excluding these categories of sources from the NPDES permit program is unlawful under both FWPCA and section 13 of the Rivers and Harbors Act of 1899, 30 Stat. 1152, 33 U.S.C. § 407 (1970).[3] NRDC does not press for injunctive relief at this time.

Defendants Train and EPA contend that the exempted categories of sources are ones which fall within the definition of point source but which are ill-suited for inclusion in a permit program. Pollutants, EPA maintains, are best eliminated from storm sewer, agricultural and silvicultural discharges by "process changes" which prevent pollutants from entering rainwater runoff rather than by treatment of discharges by the "end-of-pipe" method. EPA argues that the Act and its legislative history reflect congressional recognition that such runoff is to be dealt with in a nonpoint method. Moreover, it is EPA's contention that the tremendous number of sources within the exempted categories would make the permit program unworkable. Faced with this problem the Administrator harmonized the conflicting demands for regulation of point sources by exercising his discretion under the permit program to establish the challenged exemptions.

▪ Defendants-intervenors support the arguments set forth by EPA. Some of them argue further that the exempted sources were not even intended to be point sources under the Act and therefore are exempt from the permit

---

2. The regulations also allow a state administering its own permit program for discharges pursuant to section 402(b) to exclude the same sources from its individual permit program. 40 C.F.R. 124.11(f), (h) (1974).

3. Section 13 is sometimes referred to as the Refuse Act of 1899. *United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 658 n. 5, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973).

requirements.[4] However, the court concludes that the power to define point and nonpoint sources is vested in EPA and should be reviewed by the court only after opportunity for full agency review and examination. In the court's view the only issue to be determined is whether FWPCA allows the Administrator the latitude to exempt entire classes of point sources from the NPDES permit requirements. The court holds that it does not.

■■■■ The judicial decisions interpreting FWPCA and the Rivers and Harbors Act and the legislative history of FWPCA support plaintiff's contentions that all discharges by point sources were intended to be covered by a permit. Decisions of the Supreme Court of the United States and the Court of Appeals for this Circuit, while not determinative of the issue, present strong support for a finding that the Administrator erred in exempting categories of point sources from the permit requirements.

The most important of the judicial precedents is the Supreme Court's decision in *United States v. Pennsylvania Industrial Chemical Corp. (PICCO)*, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973), which involved section 13 of the Rivers and Harbors Act of 1899. The primary issue before the Court was whether section 13 was an absolute prohibition on discharging without a permit, even though no formal permit program had been established. The Court held that the section was such a prohibition, even though it was impossible for dischargers to obtain permits.

A formal permit program under section 13 was subsequently established and that permit program was later incorporated in the new permit program authorized by section 402 of FWPCA. Section 402 prohibits further issuance of permits under section 13 of the Rivers and Harbors Act and designates the Administrator of EPA as the exclusive authority to permit discharges of pollutants into navigable waters. *PICCO, supra*, 411 U.S. at 657 n. 2, 658 n. 7, 659 n. 9, 93 S.Ct. 1804. Section 402 specifically provides as follows:

> Sec. 402. (a) . . . (4) All permits for discharges into the navigable waters issued pursuant to section 13 of the Act of March 3, 1899, shall be deemed to be permits issued under this title, and permits issued under this title shall be deemed to be permits issued under section 13 of the Act of March 3, 1899, and shall continue in force and effect for their term unless revoked, modified, or suspended in accordance with the provisions of this Act.

Therefore, while *PICCO* dealt with a prior law, it is equally applicable to the statute now at issue. Indeed the Supreme Court stated that the later water quality legislation expressly complements section 13 of the 1899 Act:

> "Section 13, although authorizing the Secretary of the Army to permit certain water deposits, contains no criteria to be followed by the Secretary in issuing such permits. The water quality legislation, on the other hand, calls for the setting of minimum water quality standards, and once such standards are established, federal permit authority, such as that vested in the Secretary of the Army by the second proviso to § 13, is specifically limited to that extent—*i. e.*, a permit could not be granted by the Secretary unless the discharge material met the applicable standards. Water Quality Improvement Act of 1970, § 103, 84 Stat. 107. In essence, therefore, the Water Quality Acts placed a limitation

---

4. The State of Washington and the National Forest Products Association contend that silvicultural activities were intended to be nonpoint sources. Similarly the State of Colorado and the Colorado River Water Conservation District argue that Congress never intended to treat agricultural activities involving irrigation runoff and return flow as point source pollution.

on the Secretary's permit authority without undermining the general prohibitions of § 13."

*PICCO, supra* 411 U.S. at 668–69, 93 S. Ct. at 1814.

The Supreme Court's ruling in *PICCO* is especially pertinent because it reversed the decision of the Third Circuit on which EPA relied in preparing to promulgate the exemption regulations. *See United States v. Pennsylvania Industrial Chemical Corp.*, 461 F.2d 468 (3d Cir. 1972). The circuit court found that the Rivers and Harbors Act provision banning discharges without a permit was not intended to be effective unless a permit program was established. By analogy, EPA's staff reasoned that if EPA refused to accept permit applications from exempted sources then those sources did not need to comply with the permit requirements and could not be prosecuted for discharging without a permit.[5] This reasoning effectively was undercut by the Supreme Court's ruling that the statute clearly prohibited discharges without a permit, regardless of whether it was possible to obtain one. The court finds it difficult to believe that the implementation of the permit programs alters the import of *PICCO*.[6]

This view is supported by the recent decision of the Court of Appeals for the District of Columbia Circuit in *Natural Resources Defense Council v. Train*, 510 F.2d 692 (1974). In discussing the permit system established by section 402 the court stated:

"After dates set forth in that section, a person must obtain a permit and comply with its terms in order to discharge any pollutant."

The accompanying footnote stated in part:

"As a result, compliance with the permit program is a prerequisite to lawful discharge of pollutants. . . ."

510 F.2d at 696. And at another point the court noted:

"After December 31, 1974, however, persons discharging pollutants must have obtained a permit in order to have a legal defense against prosecution."

510 F.2d at 707. Admittedly, these cases did not deal with the specific issue before the court. Therefore, although their language is strong authority for the proposition that EPA may not exempt entire categories of sources from the permit requirement, it is not dispositive.[7] The court therefore turns

---

5. *See* Memorandum from Robert V. Zener, Associate General Counsel *printed in* Hearings on Control of Pollution From Animal Feedlots Before a Subcomm. of the House Comm. on Government Operations, 93d Cong., 1st Sess. 666–67 (1973). The conclusions reached in that memorandum were criticized in detail by the Subcommittee Staff. *See* Subcommittee Staff Memorandum of March 11, 1974, *printed in* House Comm. on Government Operations, Control of Pollution From Animal Feedlots and Reuse of Animal Wastes, H.R.Rep.No.93–1012, 93 Cong., 2d Sess. 55–60 (1974) (hereinafter cited as Feedlot Report).

6. The House Committee on Government Operations reached a similar conclusion. The Committee's Conservation and Natural Resources Subcommittee had been monitoring EPA's administration of the 1972 amendments in general and the permit program in particular. The Subcommittee objected to the proposed EPA regulation requiring permits only for feedlots of a certain size.

The regulation was promulgated notwithstanding those objections. The committee report states:

"In any event, there is no legal basis for EPA's administrative exclusion of any point source from the NPDES permit program under the Federal Water Pollution Control Act. The law requires that all point sources be subject to the permit program."

Feedlot Report, *supra* note 5, at 5.

7. Another case which lends support to NRDC's interpretation of the Act is *Colorado Public Interest Research Group, Inc. v. Train*, 507 F.2d 743 (10th Cir. 1974), in which the court found that the EPA did not have authority to except certain types of radioactive material from regulation since the language of the statute clearly encompassed all radioactive materials. Also relevant is *Scenic Hudson Preservation Conference v. Callaway*, 370 F.Supp. 162 (S.D.N.Y.1973), aff'd, 499 F.2d 127 (2d Cir. 1974) (per curiam), involving section 404, another of the

to the general considerations relevant to interpreting statutory provisions.

"In construing statutes, courts must first look to the language of the legislation; if its language 'admits of no more than one meaning, the duty of interpretation does not arise . . ..' " *United ed Shoe Workers of America, AFL–CIO v. Bedell*, 506 F.2d 174, 178 (D.C. Cir. 1974) (footnotes omitted). In the present case the plain language of section 301 provides that "[e]xcept as in compliance with this section and section . . . 402 . . . of this act, the discharge of any pollutant by any person shall be unlawful." Section 402 then provides that "the Administrator may . . . issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 301(a) . . .." The government supplies a strained interpretation of this language, arguing that the word "may" indicates discretion and thus means that the Administrator may grant or deny a permit, or may exempt whole categories of point sources from the permit program. This result requires more imagination than the court is willing to exercise.

Indeed, the court has examined carefully all of section 402 and finds no support for defendants' contentions. While Congress may have considered manufacturing facilities and waste treatment works to be the primary targets of the Act, it gave no indication that it approved exemptions for other categories of point sources. Clearly it would have done this, just as it did for all nonpoint sources. The Act does seem to indicate that at least some agricultural and silvicultural sources are apparently of a nonpoint nature and are thus not subject to the more detailed requirements applica-

ble to point sources. *See* FWPCA § 208(b)(2)(F), 33 U.S.C. § 1288(b)(2)(F) (Supp. III, 1973).[8] However, there is no evidence from the language of the statute to support the categorical exemptions of point sources granted by the Administrator.

The court, therefore, believes that it is unnecessary to look to the legislative history of the Act for guidance. Nonetheless, if the background of the legislation is examined, it provides additional support for plaintiff's position.

The report accompanying the House Committee bill, H.R. 11896, states the intent of Congress in clear and straightforward language:

"Subsection (a) of section 301 establishes that any discharge of a pollutant not in compliance with sections 301, 302, 306, 307, 318, 402 and 404 is unlawful. Any discharge of a pollutant without a permit issued by the Administrator under section 318, or by the Administrator or the State under section 402 or by the Secretary of the Army under section 404 is unlawful."

H.R.Rep.No.92–911, 92d Cong., 2d Sess. 100 (1972), *reprinted in* Environmental Policy Division of the Congressional Research Service, A Legislative History of the Water Pollution Control Act Amendments of 1972, 93d Cong., 1st Sess., Vol. I, at 147 (Senate Public Works Comm. Print 1973) (hereinafter cited as Legislative History). Sections 301(a) and 402(a)(1) of that bill are essentially identical to the Act as passed.[9]

The provisions of the Senate bill, S. 2770, while not identical to the Act, are substantially similar to it. The report accompanying S. 2770 describes section 301 as clearly establishing that the dis-

---

specific exceptions to section 301(a). In that case the court agreed with the plaintiffs that a permit was required in all cases involving the discharge of dredged or fill material into navigable waters. *Id.* at 171. *See also People of the State of California v. E. P. A.*, 511 F.2d 963 (9th Cir. 1975) (federal agencies not exempt from state permit programs).

8. Some of the intervenors argue that section 208 indicates a congressional intent to exclude all agricultural and silvicultural activities from the permit program. As noted above, the court finds it unnecessary to determine this issue.

9. Section 402(a)(1) of H.R. 11896 contained a provision dealing with thermal discharges that is not in the Act.

charge of pollutants is unlawful. It continues:

> "But the Committee recognizes the impracticality of any effort to halt all pollution immediately. Therefore, this section provides an exception if the discharge meets the requirements of this section, Section 402, and others listed in the bill."

S.Rep.No.92–414, 92d Cong., 1st Sess. 42–43 (1971), U.S.Code Cong. & Admin. News, 1972, pp. 3668, 3709, *reprinted in* Legislative History, *supra*, Vol. II, at 1460. This report indicates that the discharge must meet the effluent limitations of section 301, and must be pursuant to a permit issued under the Act.

This conclusion is supported by numerous other passages in the legislative history including a letter from William Ruckelshaus, then Administrator of EPA, to the Office of Management and Budget recommending presidential approval of S. 2770. In summarizing the provisions of the bill, Mr. Ruckelshaus stated:

> "No discharge of any pollutant will be permitted, except as authorized by a permit issued under the new Act. ·No Refuse Act permit may be issued after enactment of the legislation. However, Refuse Act permits heretofore issued shall continue in force and effect as though issued under authority of this enrolled bill."

Legislative History, *supra*, Vol. I, at 143. In addition, Congressman Jones of Alabama inserted into the record a statement highlighting the important aspects of the legislation. Paragraph 24 of that statement notes that the Act

> "[d]eclares to be unlawful the discharge of any pollutant by any person except as specifically authorized in the bill. The bill establishes a Federal-State discharge permit program. All permits issued under this program shall be consistent with the specific requirements of the bill, including effluent limitations, national standards of performance, toxic and pretreatment standards, and ocean discharge."

118 Cong.Rec. 10208 (1972) (debate on H.R. 11896), *reprinted in* Legislative History, *supra*, Vol. I, at 362.

To allow the exemptions made by the Administrator is to diminish the effect of the Act. Section 301 contemplates that discharges from most point sources will be abated by application of the best available technology economically achievable by July 1, 1983. FWPCA § 301 (b)(2)(A), 33 U.S.C. § 1311(b)(2)(A) (Supp. III, 1973). This is to be effectuated by means of a permit program which enforces progressively stricter limitations on permit holders. If the limitations are not met, the permit may be revoked and discharging must cease. If a point source is exempted from the permit requirement, the Administrator then has no effective control over the polluter.

Federal defendants argue that although point sources in the exempted categories need not obtain permits they are still required to meet effluent guidelines. *See* 38 Fed.Reg. 18001–18002 (1973). Plaintiff points out, however, that "even at this late date there are no effluent guidelines applicable to the categories of dischargers excluded from the NPDES program." NRDC also notes that the question of whether certain of EPA's effluent guidelines are enforceable independently of their application and implementation in individual NPDES permits is now involved in more than 80 lawsuits brought by industrial dischargers. Plaintiff summarized the matter cogently:

> "Finally—and this is the most fundamental point—even if EPA were to develop effluent guidelines for the excluded categories and even if the agency's position that such guidelines can operate independently as performance standards is ultimately vindicated, the permit program would still be needed to ensure the effective implementation and enforcement of those guidelines. Even with effluent guidelines, the permit process is indispensable because (1) the permit application requirement identifies dischar-

gers for EPA and reveals what they are discharging, basic information which is otherwise lacking, (2) the permit puts the discharger on full notice of its cleanup responsibilities so there is no question as to inadequate notice or confusion regarding the Act's requirements, (3) the permit contains an enforceable schedule of compliance with mileposts to gauge the discharger's success in meeting the Act's abatement deadlines, (4) EPA's compliance monitoring program is geared to the permit program (for example, permit holders are required to monitor their own discharges and make periodic reports to EPA and the states), and (5) the existence of a permit greatly simplifies the enforcement of the Act's requirements by eliminating many issues which might otherwise arise in an enforcement proceeding."

Plaintiff's Supplemental Memorandum In Support of Motion for Summary Judgment, at 11–12 (filed Nov. 14, 1974) (footnotes omitted). It seems evident to the court that such exemptions from the permit requirement, in light of the purpose and design of the Act, thwart its enforcement mechanisms and are contrary to the intent of Congress.

In spite of the history and logic of the Act, defendants contend that the exemptions are absolutely necessary in order for EPA to carry out its duties. The court is not insensitive to EPA's contention that enforcement of the Act according to NRDC's interpretation would present insoluble administrative problems and make the Act itself unworkable. The court is well aware that EPA has been assigned expansive tasks with often limited funding and the court has no desire to increase EPA's burdens to the detriment of its programs. Certainly, in some cases the courts have allowed agencies to broadly interpret the law and to develop procedures for administering it in a logical and manageable manner. *See, e. g., Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645,

93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); *Permian Basin Area Rate Cases,* 390 U.S. 747, 780, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). Defendants Train and EPA rely strongly on *Weinberger v. Bentex Pharmaceuticals, Inc., supra,* in which the court, in upholding an agency's interpretation of the Federal Food, Drug and Cosmetic Act, ruled that in the absence of compelling evidence of congressional intent it would not "prohibit administrative action imperative for the achievement of an agency's ultimate purposes." 412 U.S. at 653, 93 S.Ct. at 2494, *quoting Permian Basin Area Rate Cases, supra* 390 U.S. at 780, 88 S.Ct. 1344. The court cannot take issue with such a reasonable determination; but in the case at bar the compelling congressional intent is clearly present. It is expressed in the statute itself and in the legislative history, both of which demonstrate that the discharge of pollutants without a permit is unlawful. Therefore, the present case is unlike *Bentex* and is more akin to *Blair v. Freeman,* 125 U.S.App.D.C. 207, 370 F.2d 229 (1966), in which the court examined the exceedingly complex field of milk marketing regulation and concluded that a Milk Marketing Order directly affecting a billion dollar industry and thousands of milk products was an invalid departure from statutory scheme established by Congress. 370 F.2d at 232.

Concededly, the Supreme Court has counseled lower courts to show "great deference to the interpretation given the statute by the officers or agency charged with its administration." *NRDC v. Train, supra,* 510 F.2d at 706, *quoting Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Unlike the situation in *NRDC v. Train,* however, the statutory framework now at issue appears too tightly drawn to allow the interpretation made by EPA. The court in *Scenic Hudson Preservation Conference v. Callaway,* 370 F.Supp. 162 (S.D.N.Y.1973), *aff'd,* 499 F.2d 127 (2d Cir. 1974) (per curiam), was faced with a similar situation. There Consoli-

dated Edison argued that it was not required to obtain a permit under FWPCA section 404 for a hydroelectric plant since application of the section to hydroelectric projects would impair the authority exercised over them by the Federal Power Commission. The court found "that Congress would not design an Act which on its face is all-inclusive, but for specifically enumerated exceptions, and yet intend to establish an unmentioned exception of the scale suggested here. Without any indication that Con Ed's reading of the Congressional will is accurate, the carving out of so major an exception would be improper. If this was Congress' intention and the omission is mere oversight, the remedy rests in Congress' hands . . . ." 370 F.Supp. at 170. The court finds this resolution equally appropriate in the present context.

Furthermore, the court is not convinced that the permit program would be unmanageable without the exemptions granted by the Administrator since there do appear to be alternatives available to EPA for reducing the permit workload. One such alternative would be to refine and elaborate on terms such as "concentrated animal feeding operation." The very nature of this term requires that agency discretion be exercised to determine what is encompassed within its scope. Moreover, it appears that Congress intended for the agency to determine, at least in the agricultural and silvicultural areas, which activities constitute point and nonpoint sources. Senator Muskie, one of the primary sponsors of the Senate bill, indicated during debate that it would be EPA's obligation to clarify the terms point and nonpoint source. An exchange with Senator Dole is informative:

"Mr. DOLE. Another question of real concern to many farmers, stockmen and others in agriculture involves the terms 'point source' and 'nonpoint source.'

\* \* \* \* \* \*

My question is: Simply, to what sources of guidance are we to look for further clarification of the terms 'point source' and 'nonpoint source'—especially as related to agriculture?

Mr. MUSKIE. Guidance with respect to the identification of 'point source' and 'nonpoint source,' especially as related to agriculture, will be provided in regulations and guidelines of the Administrator . . . ."

117 Cong.Rec. 38816 (1971), *reprinted in* Legislative History, *supra* at 1298–99. Plaintiff argues that the Administrator has failed to meet this obligation to draw the line by regulation or otherwise between point and nonpoint sources in the areas exempted by the challenged regulations. The court agrees that if EPA had carried out its duties as directed, carefully distinguishing point and nonpoint sources and employing techniques such as those already used for mining activities, the scope of and burdens presented by the permit program would be considerably less than projected by EPA.[10]

NRDC does not contend that every farm ditch, water bar, or culvert on a logging road is properly meant to be a point source under the Act. Moreover, NRDC points out that, while all sources which are eventually defined as point sources should be regulated under an appropriate permit program, the Administrator would have wide latitude to rank categories and sub-categories of point sources of different importance and

---

10. This conclusion is supported by the report of the House Committee on Government Operations which concluded that EPA had grossly exaggerated the administrative problem and misled the public and the court about its administrative problems regarding feedlots. The Committee stated:
  "In raising the management problem, EPA has clouded the pollution question by

trying to define the choice as being either a permit system for agricultural point sources which covers every 'farm with one animal,' or the minisystem adopted by EPA last July which excludes many polluting feedlots with a large number of animals. The first borders on the ridiculous, and the second is based on expediency."
Feedlot Report, *supra* note 5, at 27.

treat them differently within a permit program. He would also have substantial discretion to use administrative devices, such as area permits, to make EPA's burden manageable. Admittedly, some sources, such as irrigation return flows and storm sewers, might pose special difficulties. Nevertheless, such difficulties must not stand in the way of Congress' mandate that a comprehensive permit program covering all point sources be established.

In light of the foregoing, the court holds that the Administrator cannot lawfully exempt point sources discharging pollutants from regulation under NPDES. It appearing that no genuine issue of material fact exists, the court will therefore grant plaintiff's motion for summary judgment and will deny the motions to dismiss or for summary judgment filed by defendants and defendants-intervenors. A judgment will be entered after an opportunity for comment on its form by the parties. An appropriate Order accompanies this Memorandum.