OPINION OF THE COURT
Read, J.
Runoff from rain and snow melt courses over roofs, roads, driveways and other surfaces, picking up pollutants along the way. It then passes through municipal storm sewer systems into rivers and lakes, adding the pollutants accumulated during its journey to those bodies of water. These municipal storm *379 sewer systems thus differ from other entities that discharge effluents into our state’s surface waters (for example, industrial or commercial facilities and sewage treatment plants) in three major ways: precipitation is naturally occurring, intermittent and variable and cannot be stopped; although municipalities operate sewer systems, stormwater contamination results from the often unforeseen or unpredictable choices of individual residents and businesses (for example, to let litter pile up or to use certain lawn fertilizers), as well as decisions made long ago about the design of roads, parking lots and buildings; and because stormwater runoff flows into surface waters through tens of thousands of individual outfalls, each locality’s contribution to the pollution of a particular river or lake is difficult to ascertain or allocate through numeric limitations.
Federal and state law prohibit discharges of stormwater from New York’s municipal separate storm sewer systems in urbanized areas (referred to as MS4s) without authorization under a State Pollutant Discharge Elimination System (SPDES) permit. As an alternative to an individual SPDES permit, municipal separate storm sewer systems that serve a population under 100,000 (or small MS4s) may seek to discharge storm-water under a SPDES general permit. The 2010 General Permit — the subject of this lawsuit — requires these municipal systems to develop, document and implement a Stormwater Management Program (SWMP) in compliance with detailed specifications developed by the New York State Department of Environmental Conservation (DEC or the Department) to limit the introduction of pollutants into stormwater to the maximum extent practicable. To obtain initial coverage (i.e., authorization to discharge) under the terms of the 2010 General Permit, small MS4s must first submit a complete and accurate notice of intent (NOI) to DEC.
After the 2010 General Permit took effect on May 1st of that year,[1] the Natural Resources Defense Council, Inc. (NRDC) and seven other environmental advocacy groups (collectively, *380 NRDC) brought this hybrid CPLR article 78 proceeding/ declaratory judgment action against DEC to challenge certain aspects of the 2010 General Permit. NRDC claims generally that by allowing small MS4s to gain coverage under the 2010 General Permit based upon an NOI reviewed only for completeness and not subject to an opportunity for a public hearing, DEC has created an “impermissible self-regulatory system” that fails to force local governments to reduce the discharge of pollutants to the maximum extent practicable — the statutory standard — and violates federal and state law.[2] Equating NOIs with applications for individual SPDES permits, Supreme Court granted partial relief to NRDC (35 Misc 3d 652 [Sup Ct, Westchester County 2012]). The Appellate Division, as relevant here, rejected NRDC’s federal and state law challenges to the 2010 General Permit (120 AD3d 1235 [2d Dept 2014]). We granted NRDC leave to appeal (23 NY3d 901 [2014]), and now affirm.
L
Background
The NPDES and SPDES Programs
The Federal Water Pollution Control Act Amendments of 1972 (Pub L 92-500, 86 US Stat 816-904, codified as amended at 33 USC §§ 1251-1388), popularly known as the Clean Water Act, ushered in the modern era of water pollution control whereby discharges of pollutants from “point sources” (i.e., “any discernible, confined and discrete conveyance” [33 USC § 1362 (14)]) into the waters of the United States are prohibited except as authorized by a National Pollutant Discharge Elimination System (NPDES) permit issued by the Administrator of the United States Environmental Protection Agency (EPA or the Agency). “Generally speaking,” the statute envisaged *381 site-specific individual NPDES permits that “place [d] limits on the type and quantity of pollutants that can be released into the Nation’s waters” (South Fla. Water Management Dist. v Miccosukee Tribe, 541 US 95, 102 [2004]).
Although the federal government plays the dominant role in water pollution control under the Clean Water Act, states may continue their own water pollution control regulations as long as they are at least as stringent as federal law demands (33 USC § 1370). And importantly, states are allowed to administer the NPDES permit program for discharges into navigable waters within their borders, subject to the Administrator’s approval (33 USC § 1342 [b]). To attain this approval, a state must demonstrate that its permit program meets the requirements of the Clean Water Act and that the state possesses adequate legal authority to implement it (id.). In 1973, the legislature amended the Environmental Conservation Law to create SPDES, New York’s version of NPDES (see L 1973, ch 801 [adding a new title 8 to article 17 of the ECL and amending other provisions of article 17 to bring them into conformity with new title 8]). EPA approved New York’s SPDES program, which is administered by DEC, in 1975.
EPA’s Stormwater Exemption
In its 1973 regulations implementing the NPDES program, EPA excluded discharges from a number of classes of point sources from the permit requirement, including separate storm sewers containing only storm runoff uncontaminated by any industrial or commercial activity (see 38 Fed Reg 18000 [July 5, 1973] [40 CFR former 124.11 (f)]). EPA justified the exclusion as necessary to conserve its regulatory resources for more significant polluters. The United States Court of Appeals for the District of Columbia Circuit ruled that the Clean Water Act did not give EPA this option, but interpreted the statute to grant the Agency considerable leeway in setting permit terms (see Natural Resources Defense Council, Inc. v Costle, 568 F2d 1369, 1377 [DC Cir 1977]). Noting its “sensitivity] to EPA’s concerns of an intolerable permit load,” the D.C. Circuit suggested that area or general permits would be a permissible and “well-established” device for coping with the avalanche of NPDES permit applications anticipated in the wake of its decision (id. at 1380-1381; see also Natural Resources Defense Council, Inc. v Train, 396 F Supp 1393, 1402 [D DC 1975] [EPA has “substantial discretion to use administrative devices, such *382 as area permits,” to make its burden of permit issuance “manageable”]).
The Water Quality Act
In the Water Quality Act of 1987 (Pub L 100-4, 101 US Stat 7, codified as amended in scattered sections of 33 USC) (the Water Quality Act), Congress endorsed permits for municipal stormwater discharges “issued on a system- or jurisdiction-wide basis” (33 USC § 1342 [p] [3] [B] [i]). These permits were mandated to “include a requirement to effectively prohibit nonstormwater discharges into the storm sewers,” and “controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants” {id. § 1342 [p] [3] [B] [ii], [iii] [emphasis added]). The Water Quality Act did not define “maximum extent practicable,” but section 1342 (p)’s text and legislative history indicate that Congress had in mind something other than conventional end-of-pipe control techniques and numeric effluent limits {see 132 Cong Rec S32381 [Oct. 16, 1986] [remarks of Senator Stafford, then Chairman of the Senate Environment and Public Works Committee] [“These permits will not necessarily be like industrial discharge permits. Often, an end-of-the-pipe treatment technology is not appropriate for this type of discharge”]; see also Defenders of Wildlife v Browner, 191 F3d 1159, 1164-1165 [1999] [recognizing that Congress “chose not to include” provisions (like effluent limitations under 33 USC § 1311) for municipal storm sewer discharges (emphasis added)], amended on denial of reh 197 F3d 1035 [9th Cir 1999]).
The Water Quality Act established a timetable for EPA to issue NPDES permitting regulations and for EPA and states to issue permits for certain categories of stormwater discharges, principally discharges associated with industrial activity and discharges from large municipal separate stormwater sewer systems (those systems serving a population of 100,000 or more) {see 33 USC § 1342 [p] [2], [4]). But for the many small municipal systems (those serving a population under 100,000), the Water Quality Act embraced a different approach.
The statute directed the Administrator, in consultation with the states, to conduct studies and report the results to Congress before developing a program to regulate stormwater discharges *383 from these systems (see 33 USC § 1342 [p] [5]). The study was meant to identify sources or classes of stormwater discharges for which NPDES permits were not required by the Clean Water Act; determine, to the maximum extent practicable, the extent and nature of their pollution; and develop procedures and methods to mitigate the effect of these discharges on water quality (id.). Congress then directed EPA to “issue regulations (based on the results of the studies . . . ) which designate stormwater discharges . . . to be regulated to protect water quality and [to] establish a comprehensive program to regulate such designated sources” (id. § 1342 [p] [6]). This program was to be designed, “at a minimum,” to “(A) establish priorities, (B) establish requirements for State stormwater management programs, and (C) establish expeditious deadlines. The program [might] include performance standards, guidelines, guidance, and management practices and treatment requirements, as appropriate” (id. [emphasis added]).
New York’s 1988 Legislation
By chapter 360 of the Laws of 1988, the legislature amended the Environmental Conservation Law to authorize DEC to issue general SPDES permits, as allowed by the Water Quality Act. To this end, new section 17-0808 specified at subdivision (3) that
“[p]ermits for discharges from municipal storm sewers:
“a. May be issued on a system or jurisdiction-wide basis, pursuant to paragraph (a) of subdivision seven of section 70-0117 of this chapter;
“b. Shall include a requirement which regulates non-stormwater discharges into the storm sewers; and
“c. Shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system design and engineering methods, and such other provisions as the commissioner determines appropriate for the control of such pollutants” (emphasis added; compare 33 USC § 1342 [p] [B] [iii] [the cognate federal provision]).
Additionally, the legislature amended existing section 70-0117 of the Environmental Conservation Law to include a new subdivision (7) to provide as follows:
*384 “(a) Under the [SPDES] program . . . , the department may issue a general permit, upon application or on its own initiative, to cover a category of point sources of one or more discharges within a stated geographical area which (i) involve the same or substantially similar types of operations, (ii) discharge the same types of pollutants, (iii) require the same effluent limitations or operating conditions, (iv) require the same or similar monitoring, and (v) which will result in minimal adverse cumulative impacts.
“(b) General permits can only be issued for the following categories of discharges, if, by virtue of their nature and location, the department determines such discharges are more appropriately controlled under a general permit than under individual permits:
“(i) separate storm sewers or stormwater conveyance systems; . . .
“(c) Any general permit under this subdivision shall set forth the conditions which shall apply to any discharge authorized by such general permit.
“(d) The department may require any person authorized by a general permit to apply for and obtain an individual permit and the department shall adopt rules and regulations specifying circumstances under which an individual permit may be required.
“(e) General permits shall be governed by the procedures set forth in this article [70] for the issuance of major permits” (former ECL 70-0117 [7], renumbered ECL 70-0117 [6] [L 1994, ch 170, § 202]).
The bill that became chapter 360 was drafted by and introduced at the request of DEC, which sought general permitting authority in order to avoid “issuance of thousands of individual SPDES permits covering discharges of heat, stormwater and non-industrial waste as well as . . . discharges of a minor naturef, which] do not require the individual attention the statute currently mandates” (Bill Jacket, L 1988, ch 360 at 14 [emphasis added]). Similarly, DEC explained that general permitting would
*385 “reduce the amount of paperwork and resources dedicated to permitted discharges which do not warrant technical case review. Past regulation of such discharges has created substantial administrative burdens without corresponding increases in environmental protection. Staff time spent on processing these types of permits detracts from time that could be spent on major and toxic discharges” (id. [emphases added]).
The bill’s Senate and Assembly sponsors repeated these rationales (id. at 18, 23, 29).
EPA’s Final Rule
EPA promulgated its final rule regulating stormwater discharges from small municipalities’ separate stormwater sewer systems on December 8, 1999, effective February 7, 2000 (64 Fed Reg 68722 [Dec. 8, 1999], codified at 40 CFR parts 9, 122, 123, 124). These so-called Phase II regulations expanded the existing NPDES Phase I stormwater program.[3] The record to support the regulation of small MS4s included the studies and reports to Congress mandated by the Water Quality Act, as well as EPA’s evaluation of comments and considerable additional research and studies. Based on this record, EPA determined that surface water contamination from wet-weather discharges from these systems was best controlled by means of measures designed to reduce the quantity of pollutants introduced into stormwater and the volume of stormwater flow rather than end-of-pipe numeric limits (id. at 68753). Accordingly, the regulations required small MS4s to develop and implement a SWMP that identified best management practices to attain “minimum control measures” in six key areas: public education and outreach; public involvement; illicit discharge detection and elimination; construction site runoff control; stormwater management in new development and redevelopment; and pollution prevention and good housekeeping of municipal operations (id. at 68736, 68754-68762).
*386 EPA determined that if small MS4s carried out best management practices in accordance with their SWMPs, they would comply with the statutory standard to reduce pollutants to the maximum extent practicable {id. at 68754; see also id. at 68843 [40 CFR 122.34 (a)]); and “[a]bsent evidence to the contrary, . . . presume [d] that a small MS4 program that implements the six minimum measures . . . does not require more stringent limitations to meet water quality standards” (64 Fed Reg 68753). EPA recommended that small MS4s include the public in developing, implementing and reviewing the SWMP {id. at 68844 [40 CFR 122.34 (b) (2) (ii)]);[4] and required that all records, including a description of the SWMP, must be made available to the public for review and copying at reasonable times during regular business hours (64 Fed Reg 68846 [40 CFR 122.34 (g) (2)]).[5]
EPA interpreted the Water Quality Act as authorizing it to develop a stormwater program for small municipalities either as part of the NPDES permit program or as a stand-alone nonNPDES program, such as a self-implementing rule. EPA settled on the use of NPDES permits instead of a rule for several reasons, including a desire to maintain consistency with its Phase I program for stormwater control; to capitalize upon the existing government infrastructure for administration of the NPDES program and the regulated community’s understanding of how the NPDES program works; and to provide flexibility in order to facilitate watershed planning and sensitivity to local conditions {id. at 68739). EPA did note, however, that “[k]ey provisions” of the rule “promot[ed] a streamlined approach to permit issuance by, for example, using general *387 permits” {id. at 68740; see also id. at 68762 [although the permit to authorize a small MS4’s discharges might take the form of either an individual NPDES permit issued to one or more facilities as co-permittees or a general NPDES permit that applied to a group of small MS4s, EPA “expect(ed)” that most discharges would be authorized or “covered” under general permits for reasons of administrative efficiency and reduced paperwork burdens]). In fact, EPA recommended using general permits, rather than individual permits, for all storm-water sources newly regulated under its rule {id. at 68737).
A small MS4 that seeks coverage under a general NPDES permit for its stormwater discharges is required to submit an NOI to the permitting authority. The NOI must specify the best management practices to be implemented for each of the six required minimum control measures along with measurable goals for the development and implementation of each best management practice {id. at 68762-68764). Although “[s]everal commenters suggested that EPA require permitting authorities to approve or disapprove the submitted BMPs and measurable goals [,] EPA disagree [d] that formal approval or disapproval by the permitting authority [was] needed” {id. at 68764).[6]
EPA afforded small MS4s up to five years to fully develop and implement their SWMPs,[7] with annual reports required to document progress {id. at 68770, 68846 [40 CFR 122.34 (g) (3)]). The Agency stated that “[t]he permitting authority will use the reports in evaluating compliance with permit conditions and, where necessary, will modify the permit conditions to address changed conditions” (64 Fed Reg 68770).
*388 The 2010 General Permit
The 2010 General Permit is a 97-page document, with appendices, which requires small MS4s to develop, document and implement a SWMP that includes 44 mandatory best management practices grouped into the six program components, or minimum control measures. Many of the mandatory best management practices afford small MS4s little or no choice about what they must do to comply with the 2010 General Permit; others afford more freedom in implementation. As an example of the latter, under the minimum control measure addressing public outreach, small MS4s must develop and implement an ongoing public education and outreach program, but enjoy flexibility to decide how best to accomplish this in light of local conditions or considerations (e.g., a media campaign, presentations to community groups, outreach to commercial entities, a webpage, printed materials, posters and/or 13 other suggested ways or management practices to raise the public’s awareness and engage its participation in reducing pollution of stormwater runoff).
At the other end of the spectrum, the 2010 General Permit imposes highly prescriptive requirements for small MS4s to develop, implement and enforce a program to detect and eliminate non-stormwater (i.e., illicit) discharges. The small MS4s must develop and maintain maps showing the location of all outfalls, verify each of them in the field and conduct an outfall inventory in accordance with detailed guidance published on EPA’s website. Further, each small MS4’s program must include procedures to identify areas that are of greatest concern and describe those areas, available equipment, staff and funding; identify and locate illicit discharges; eliminate illicit discharges; and document the steps the small MS4 has taken to implement its program.
The NOI and Annual Reports Provided for by the 2010 General Permit
The NOI is currently a 19-page document that sets out the six minimum control measures, listing the mandatory and optional best management practices for each. The small MS4 must commit to each mandated and any optional best manage *389 ment practice initially identified in the SWMP;[8] describe initially identified measurable goals for each of the required or chosen best management practices, with start and end dates, including work to be done by partners. And finally, either a principal executive or ranking elected official must sign the NOI, certifying that the information submitted is, to the best of the signer’s knowledge and belief, true, accurate and complete, and acknowledging awareness of the significant penalties for submitting false information, including the possibility of fines and imprisonment for knowing violations. As noted previously (see n 6, supra), the NOI is made available to the public for comment for a 28-day period. Small MS4s that submit an NOI are authorized to discharge stormwater upon written notification from DEC that a complete NOI has been received. DEC, however, may also choose to require the small MS4 to submit an application for an individual SPDES permit or an alternative SPDES general permit. DEC annually audits up to 10% of all municipal storm sewers, makes site inspections, reviews citizen complaints and, where necessary, takes enforcement action.
The vast majority of New York’s 500 plus small MS4s achieved initial authorization to discharge stormwater prior to the effective date of the 2010 General Permit; they were able to maintain coverage under the 2010 General Permit by submitting their 2009 annual reports (see nn 1, 2, supra). The 2010 General Permit directs small MS4s to make annual reports and SWMPs available for public review; provides for notice of receipt of 2009 annual reports to be published in the Environmental Notice Bulletin;[9] and requires small MS4s to present draft annual reports to the public and to include its responses to any public comments (including, as appropriate, any modifications of the SWMP) when they submit these reports to DEC. The annual report summarizes the activities performed by the small MS4 during the reporting period and those planned for the next year, and includes, among other things, an assessment of compliance with permit conditions; the appropriateness of the identified best management practices; and *390 progress toward meeting the measurable goals for each minimum control measure and achieving the statutory goal of reducing the discharge of pollutants to the maximum extent practicable. DEC’S review of annual reports allows the Department to keep tabs on small MS4s and to require any necessary refinement of best management practices. DEC refers to these contemplated successive rounds of reviewing and, as necessary, fine-tuning and refocusing best management practices as the “iterative process” that is the hallmark of the flexible “maximum extent practicable” standard, which Congress deliberately chose as best suited for regulating small municipalities’ storm-water discharges.
IL
Discussion
The Clean Water Act
There is no doubt that the 2010 General Permit complies with EPA’s 1999 regulations, which allow permitting authorities to authorize small MS4s to discharge stormwater under a general NPDES permit upon receipt of an NOI — i.e., without any regulatory review, public notice and comment or opportunity for a public hearing. There is likewise no doubt that the 2010 General Permit affords more generous regulatory review and public participation than EPA’s 1999 regulations require. But NRDC contends, and the dissent agrees, that the federal courts have held that the regulatory review and public participation features of EPA’s 1999 regulations, on which the 2010 General Permit is necessarily modeled, constitute an “impermissible self-regulatory system” in contravention of the Clean Water Act, and that New York courts are bound to follow suit with respect to the New York program. Stated slightly differently, NRDC and the dissent assert that federal court decisions make clear that the Clean Water Act does not allow DEC to authorize a small MS4’s stormwater discharges under the 2010 General Permit without first engaging in an undefined more detailed review of the NOI (and, apparently, the SWMP) and providing the public an opportunity to request a hearing.
After EPA promulgated its 1999 regulations, various environmental, municipal and industry groups brought petitions for review, which were consolidated in the United States Court of Appeals for the Ninth Circuit (see Environmental Defense Ctr., *391 Inc. v United States Envtl. Protection Agency, 344 F3d 832 [9th Cir 2003] [EDC]). The environmental petitioners argued that, by allowing permitting authorities to authorize small MS4s to discharge stormwater on the basis of “unreviewed NOIs,” the regulations created an “impermissible self-regulatory system,” and additionally “fail[ed] to provide for public participation as required by the Clean Water Act, because the public receive [d] neither notice nor opportunity for hearing regarding an NOI” {id. at 854, 856). A divided panel agreed.
Applying Chevron analysis,[10] the EDC majority first determined that the Clean Water Act unambiguously expressed Congress’s intent that “EPA issue no permits to discharge from municipal storm sewers unless those permits require [d] controls to reduce the discharge of pollutants to the maximum extent practicable” {id. at 854 [internal quotation marks omitted]), and that EPA’s 1999 regulations did not fulfill this plain command. This was the case, the majority reasoned, because absent a permitting agency’s “meaningful review” of the minimum control measures selected by a small MS4, [11] the municipal operator might “misunderstand! ] or misrepresent! ] its own stormwater situation and propos [e] a set of minimum measures for itself that would reduce discharges by far less than the maximum extent practicable” {id. at 854-856). The EDC majority also concluded that NOIs (unlike NRDC and the dissent, the court did not mention SWMPs) are “functionally equivalent” to NPDES permit applications, and therefore are subject to the same public availability and public hearing requirements {id. at 857).
The dissenting judge considered the “central issues” in the case to be whether the Clean Water Act allowed EPA to use a general permit system to administer the NPDES program and *392 whether NOIs should properly be regarded as “permits.” Citing Chevron, he noted that “resolution of these issues require [d] a complicated weighing of policies (e.g., administrative streamlining vs. robust inquiry) that is precisely what agencies are designed to do and courts are without the resources or experience to do” (id. at 881 [Tallman, J., dissenting]).
In the dissenting judge’s view, although the majority correctly recognized that EPA was allowed to use a general permit system, it
“ignore [d] the effects of the general permit. By filing an NOI, a discharger obligates itself to comply with the limitations and controls imposed by the general permit under which it intends to operate. EPA mandates that all permits (including general permits) condition their issuance on satisfaction of pollution limitations imposed by the Clean Water Act[;] . . . [therefore, the general permit imposes the obligations with which the discharger must comply (including applicable Clean Water Act standards), and EPA’s decision not to review every NOI is not a failure to insure compliance with the [statute]” (id. at 882).
As for the majority’s objection that EPA’s general permit system did not allow for sufficient public participation, the dissenting judge chided his colleagues for “failfing] to give deference to EPA and imposing] the majority’s own wishes instead” (id.). He added that where “an agency promulgates rules after a deliberative process, it is incumbent upon [the federal courts] to respect the agency’s decisions or else risk trivializing the function of that agency”; and that “[i]n this case, EPA made a permissible decision to create a general permit program supported by NOIs” (id.).[12]
In Texas Ind. Producers & Royalty Owners Assn. v Environmental Protection Agency (410 F3d 964 [7th Cir 2005]), the United States Court of Appeals for the Seventh Circuit agreed with the dissenting judge in EDC that NOIs are not subject to the Clean Water Act’s public participation requirements for NPDES permit applications. As mentioned earlier (see n 3, *393 supra), EPA’s Phase I stormwater regulations addressed construction activities involving five or more acres, and its Phase II stormwater regulations addressed construction sites that disturb one to five acres (as well as small MS4s). EPA eventually promulgated a general permit for stormwater discharges from both large and small construction sites in those jurisdictions where it had not authorized the state or an Indian tribe to administer the NPDES program. This general permit required operators to submit an NOI to acquire coverage; a responsible corporate officer to certify the basis for eligibility for coverage; creation, maintenance and implementation of a site-specific Storm Water Pollution Prevention Plan (SWPPP), also to be certified by a corporate official; and implementation of best management practices necessary to comply with water quality standards, assure weekly site inspections and document those inspections, including detailing weather conditions.
In its petition for review, NRDC attacked the general permit’s failure to make NOIs and SWPPPs available to the public and afford the opportunity for a public hearing, citing 33 USC § 1342 (j) and (a) (l).[13] EPA responded that these provisions did not apply to NOIs and SWPPPs because NOIs and SWPPPs were not permits or permit applications. The Seventh Circuit concluded that because the Clean Water Act spoke only of permits and permit applications, not NOIs or SWPPPs, the statute was silent or ambiguous for purposes of Chevron analysis. Accordingly, the court was called upon to decide whether EPA had reasonably construed the relevant provisions of the Clean Water Act.
In support of its interpretation, EPA “stresse[d]” that general NPDES permitting did not “make use of a permit application”; rather, general permits were proposed through a notice in the Federal Register to solicit public comment, and “[i]t [was] at that time that the public [had] the opportunity to request a public hearing” {id. at 978). Once EPA issued the general permit as a final rule, a discharger intending to operate under the general permit’s authority was required to comply with *394 that permit’s already established terms; therefore, “there [was] no need for additional public comment or a notice period,” and potentially requiring a public hearing for individual NOIs and SWPPPs risked “eviscerat[ing] the administrative efficiency inherent in the general permitting concept, in effect making the general permit scheme no different from the process for obtaining individual permits [, which] would be inconsistent with Congress’ intent to allow for the use of general permits” (id. [citation omitted]).
Calling these rationales “eminently reasonable,” the Seventh Circuit concluded that “EPA’s interpretation of the terms ‘permit application’ and ‘permit’ as not including NOIs and SWPPPs is a permissible construction” (id.). In so holding, the court acknowledged that it disagreed with the EDC majority and agreed with the dissenting judge in that case, thus creating a split between the circuits (id. n 13).[14]
In sum, then, the federal circuit courts are split on the question of whether EPA has permissibly interpreted the Clean Water Act to mean that an NOI is not a “permit application.”[15] And we obviously may not engage in Chevron analysis to review EPA’s interpretation, which underlies the corresponding, although not identical, parts of the 2010 General Permit to *395 which NRDC objects. The federal courts and EPA will have to sort this out.[16] In that regard, NRDC has recently filed a petition for a writ of mandamus in the Ninth Circuit in the EDC case, asking that court to order EPA to amend its 1999 regulations within six months to provide individualized review of NOIs with notice and opportunity for public hearings. This is all the more reason, DEC argues, to reject “NRDC’s attempt to litigate an underlying dispute with EPA by ordering relief against DEC for complying with EPA’s regulations.” We agree. Unless and until EPA revises its 1999 regulations, DEC’s SP-DES general permitting program for small MS4s must comply with them (as it concededly does), and DEC need not go beyond the specifications of those regulations unless New York law requires it to do so.
The Environmental Conservation Law
A SPDES general permit covers multiple entities with similar characteristics and minimal impacts (see ECL 70-0117 [6] [a]). SPDES general permitting allows DEC to avoid detailed review where it is not warranted and thereby frees up finite regulatory resources for the individual SPDES permitting of entities with greater impact on the environment. These were the reasons that DEC gave the legislature when it sought SP-DES general permitting authority in 1988, after Congress endorsed NPDES general permitting in the Water Quality Act, and the explanations that the legislation’s sponsors gave when *396 the Environmental Conservation Law was amended to empower DEC to issue SPDES general permits.
The legislature has exhibited a continuing willingness to simplify and streamline the SPDES permitting process to reduce or eliminate administrative complexities that burden DEC and the regulated community alike in ways that do not benefit the environment. For example, in 1994 the legislature amended the Environmental Conservation Law to expand general permitting and require DEC to develop a priority ranking system for individual SPDES permits in order to carry out an “environmental benefit permit strategy” (EBPS) (see L 1994, ch 701). Broadly described, the EBPS prioritizes SPDES permits for full technical review and, when necessary, modification, in order to insure that those point source discharges presenting the greatest risk to the environment receive the most expedient and detailed regulatory attention (see generally New York State Department of Environmental Conservation, Technical and Operational Guidance Series 1.2.2 [“Administrative Procedures and the Environmental Benefit Permit Strategy for Individual SPDES Permits” (issued June 2003, rev Jan. 2012)]; see also ECL 17-0805 [1] [b] [making a SPDES permit’s priority ranking subject to an opportunity for a public hearing]).
NRDC and the dissent blur the distinction between SP-DES general and individual permits by seeking to require DEC to undertake an undefined more comprehensive review of NOIs (and, apparently, to review SWMPs), and to provide an opportunity for a public hearing on NOIs/SWMPs. Thus, NRDC would like DEC to treat an NOI as though it were, or at least more like, an application for an individual SPDES permit to be issued rather than what it really is — a request for coverage under a general SPDES permit that has already been issued pursuant to the full panoply of article 70 procedures (see ECL 70-0117 [6] [e]; 6 NYCRR part 621).[17] But the Environmental Conservation Law does not obligate DEC to conduct SPDES *397 general permitting for small MS4s in accordance with NRDC’s and the dissent’s policy preferences. SPDES general and individual permits represent alternative ways for small MS4s to obtain authorization for their stormwater discharges. To the extent the courts force DEC to apply the same or similar procedures for both alternatives, the resource-conserving benefits sought by the legislature when it enacted the 1988 legislation are compromised, if not altogether lost.
Here, DEC has determined that examining NOIs for completeness constitutes a sufficient level of technical regulatory review to qualify a small MS4 for initial coverage under the 2010 General Permit; and that the 2010 General Permit’s public participation requirements for NOIs (i.e., notices in the Environmental Notice Bulletin to let the public know when a small MS4’s NOI has been submitted to DEC and where the NOI and SWMP are physically located and may be inspected; making the NOI, which DEC posts on its website, subject to a pre-authorization 28-day public comment period) are adequate. These are reasonable judgments that DEC possesses the discretion and expertise to make in furtherance of its responsibilities under the Environmental Conservation Law to regulate storm-water discharges from small MS4s (see Matter of Howard v Wyman, 28 NY2d 434, 438 [1971] [“It is well settled that the construction given statutes and regulations by the agency responsible for their administration, if not irrational or unreasonable, should be upheld”]; Matter of Davis v Mills, 98 NY2d 120, 125 [2002] [“(T)his Court treads gently in second-guessing the experience and expertise of state agencies charged with administering statutes and regulations”]).
We have reviewed NRDC’s other challenges to the lawfulness of the 2010 General Permit and consider them likewise to be without merit. Accordingly, the order of the Appellate Division, insofar as appealed from, should be affirmed, with costs.

. DEC issued the first General Permit in 2003 for a five-year period, and in 2008 issued a revised two-year General Permit, which expired on April 30, 2010. The five-year 2010 General Permit expired on April 30, 2015. A substantively identical new two-year General Permit took effect on May 1, 2015 and expires on April 30, 2017. Almost all the 500 plus small MS4s authorized to discharge stormwater under the challenged 2010 General Permit were initially covered by the 2008 (or, before that, the 2003) General Permit. The 2010 General Permit authorized them to discharge stormwater on an interim basis for up to 180 days after May 1, 2010. These small MS4s gained *380 coverage under the 2010 General Permit by submission of their annual reports (discussed later in more detail) due in June 2010; they were not required to and did not submit NOIs.

. As previously observed (see n 1, supra), virtually all the small MS4s in the state achieved coverage under the 2010 General Permit by virtue of NOIs that they submitted to DEC for initial coverage under the 2003 or 2008 General Permits, and their 2009 annual reports. As a result, the practical effect of a ruling in favor of NRDC is not self-evident, and threatens to create considerable confusion; i.e., would these small MS4s be required to resubmit an NOI, or would they be grandfathered? (See 6 NYCRR 750-1.21 [d] [3].)

. As the first step in carrying out the requirements of the Water Quality Act, the Phase I program covered NPDES permitting of stormwater discharges from MS4s serving a population of 100,000 or more and stormwater discharges associated with industrial activity, including construction activities involving five or more acres (33 USC § 1342 [p] [2], [4]; see also 55 Fed Reg 47990 [Nov. 16, 1990]). In addition to small MS4s, the Phase II regulations also addressed construction sites that disturb one to five acres and additional sources that might be designated on a case-by-case basis (64 Fed Reg 68722).

. The 2010 General Permit requires small MS4s to provide the public with the opportunity to participate in the development, implementation, review and revision of the SWMP. In this context, “development” means the “period after initial authorization under [the 2010 General Permit] when the [small MS4] creates, designs or develops activities, BMPs [best management practices], tasks or other measures to include in [its] SWMP”; and “implementation” means the “period after development of [the] SWMP, where the [small MS4] puts into effect the practices, tasks and other activities in [its] SWMP.” (New York State Department of Environmental Conservation, SPDES General Permit for Stormwater Discharges from Municipal Separate Storm Sewer Systems [MS4s], Permit No. GP-0-10-002 at 30-31, 88, 90, available at http://www.dec.ny.gov/docs/water_pdfyms4gp2011.pdf, cached at http://www.nycourts.gov/reporter/webdocs/ms4gp2011.pdf [hereinafter 2010 General Permit].)

. The 2010 General Permit directs small MS4s to ensure that copies of SWMPs and annual reports are available for public inspection.

. EPA allows a small MS4 that submits a complete and timely NOI to discharge upon receipt of the NOI by the state permitting authority, after a waiting period specified in the general permit, on a date specified in the general permit or upon receiving notice of inclusion from the state permitting authority (see 40 CFR 122.28 [b] [2] [iv]). By contrast, the 2010 General Permit requires DEC to publish a notice in the Environmental Notice Bulletin when an NOI is received from a small MS4. These notices provide a web link to the actual NOI, and inform the public of the physical location of the NOI and SWMP, which are available for public inspection. The NOI is subject to a 28-day public comment period prior to DEC’S authorization of the small MS4’s discharges.

. DEC reduced the time period from five to three years for the New York program.

. Small MS4s in specified watershed improvement strategy areas must identify the additional best management practices that they will implement in order to reach specified pollutant load reductions.

. The 2010 General Permit states that “[f]or public participation purposes, the [2009] Annual Report will be considered equivalent to submission of an NOI.” (2010 General Permit at 8.)

. The United States Supreme Court held in the seminal case of Chevron U.S.A. Inc. v Natural Resources Defense Council, Inc. (467 US 837 [1984]) that federal courts will accept a federal agency’s reasonable interpretation of the ambiguous statutory language of statutes that the agency administers.

. As pointed out earlier, EPA’s 1999 regulations did not require any review of NOIs. DEC takes the position that its review of NOIs for completeness is “meaningful review”; specifically, DEC does not authorize a small MS4’s stormwater discharges until after examining the NOI to make sure that the system operator has committed to carrying out a SWMP that comprehends, at a minimum, 44 mandatory best management practices (clearly identified in the NOI as “required”), and has established measurable goals by which to assess how successfully these best management practices, as implemented, control stormwater discharges to the maximum extent practicable.

. The dissent comments that the Supreme Court “has chosen not to take up [EDC\,” citing Texas Cities Coalition on Stormwater v EPA (541 US 1085 [2004]) (dissenting op at 418). The Texas Cities Coalition sought Supreme Court review of its challenge to EPA’s 1999 regulations, primarily on Tenth Amendment grounds.

. Section 1342 (j) of the Clean Water Act provides that “[a] copy of each permit application and each permit issued under this section shall be available to the public. Such permit application or permit, or portion thereof, shall further be available on request for the purpose of reproduction”; section 1342 (a) (1) authorizes the EPA, “after opportunity for public hearing, [to] issue a permit for the discharge of any pollutant, or combination of pollutants” (see ECL 17-0805 [1] for the cognate provisions in state law).

. The parties disagree about the relevance of a third federal case, Waterkeeper Alliance, Inc. v United States Envtl. Protection Agency (399 F3d 486 [2d Cir 2005]), which the United States Court of Appeals for the Second Circuit handed down after EDC and before Texas Ind. Producers. This decision invalidated portions of EPA’s 2003 regulations governing NPDES permitting for concentrated animal feeding operations, which are variously-sized but large-scale enterprises that raise animals like cows and pigs in confined quarters. Waterkeeper Alliance, however interpreted, does not eliminate the circuit split.

. We recognize that at least one statement in EPA’s 1999 regulations does not appear facially consistent with its position in the EDC and Texas Ind. Producers lawsuits. The EDC majority remarked that “[t]he text of [EPA’s] Rule itself acknowledges that a Phase II NOI is a permit application that is, at least in some regards, functionally equivalent to a detailed application for an individualized permit” (EDC, 344 F3d at 853 [emphasis added]). In support of this proposition, the EDC majority (and the dissent [see dissenting op at 423 n 10]) cite 40 CFR 122.34 (d) (1), which starts out by stating “[i]n your permit application (either a notice of intent for coverage under a general permit or an individual permit application).” Section 122.34 is written in a “readable regulation” format as an answer to the question “As an operator of a regulated small MS4, what will my NPDES storm water permit require?” It is the task of the federal courts, not this Court, to figure out whether section 122.34 (d) (1) or anything else in EPA’s 1999 regulations is inconsistent with the Agency’s litigation posture in EDC and Texas Ind. Producers and, if so, the significance of the inconsistency.

. The dissent protests that our “ ‘hands-off’ approach would leave this Court with no authority to consider the legality of state agency conduct [,] [which] is most certainly not the law, as made plain by [our] administrative law jurisprudence” (dissenting op at 423). The dissent then cites four cases, only one of which — Seittelman v Sabol (91 NY2d 618 [1998]) — involves federal law, and in Seittelman, the issue was whether we owed deference to a state agency’s interpretation of a federal statute. Here, NRDC is asking us to decide that a federal agency — EPA—has improperly interpreted the statute it is tasked with administering. This is quite different from Seittelman. DEC operates the SPDES program as EPA’s NPDES delegee, and is bound to follow EPA’s interpretation of the Clean Water Act, here expressed, as challenged, in EPA’s 1999 regulations. Federal law vests exclusive jurisdiction to review those regulations in the federal circuit courts (see 33 USC § 1369; see also American Frozen Food Inst. v Train, 539 F2d 107, 124 [DC Cir 1976]). Under the dissent’s view and notwithstanding section 1369 of title 33, the highest court in every state that administers the NPDES permit program would be empowered to second-guess EPA’s governing regulations, creating an obvious impediment to implementation of a coherent nationwide NPDES permitting scheme.

. In fact, the public enjoyed opportunities to participate in the development of the 2010 General Permit which exceed article 70’s requirements. In the fact sheet issued with the 2010 General Permit, DEC explained that, in response to "significant public interest” in the 2008 General Permit, it limited that permit’s term to two years and embarked on an 18-month post-issuance review process. All commenters on the 2008 General Permit were invited to participate, and DEC conducted nine monthly topic meetings to address green infrastructure, intermunicipal cooperation, stormwater retrofits, public participation, numeric effluent limits, MS4 funding, steep slopes, riparian buffers, total maximum daily loads and impaired waters. Following these *397 meetings, working drafts of a revised general permit and revised chapters of DEC’S Stormwater Management Design Manual were reviewed with the participants. Meetings were held to discuss proposed changes to the design manual and the general permit; participants were invited to submit comments on the working drafts. DEC incorporated beneficial provisions identified during this 18-month review in the 2010 General Permit.